## Louisville & N. R. Co. v. Hooker.

(Decided Nov. 20, 1936.)

ASHBY M. WARREN, J. J. TYE and THOMAS D. TINSLEY for appellant.

TUGGLE & TUGGLE for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

Andrew Hooker brought this action by his mother, as next friend, on April 27, 1935, in the Knox circuit

court, to recover damages for his alleged wrongful ejectment from appellant's train.

The record discloses that upon the occasion in evidence the infant, Andrew Hooker, boarded the appellant's train at Heidrick, Ky., with the intention of riding to the nearby town or station of Rodonald.

The facts are, according to the plaintiff's testimony as to his boarding the train and his later ejectment therefrom, as follows:

"I got on the train and when I got on there and went down the road about two mile, down about Beech Hill, and the conductor came through and took up the money and tickets * * *. So I gave him my money and he put it in his pocket, the sixteen cents, and walked through the coach and finished taking up tickets, then he come back to me, said, 'Son, you will have to get off,' he said 'You ain't got enough money.' I says, 'That is all I have been paying.' Says, 'You will have to get off the train.' Says, 'You look like a sixteen year old boy. You will have to get off.' I says, 'I will pay the rest of it when I come back on the train.' So I got up and got up [off] there. He didn't give the money back to me until I got on the platform, and the steps was kindly snowy and slippy, and he kindly give me a push."

Further, he testified that "it was a sleety day, rainy and snowing, cold, windy day" and stated, as to his actions after he was put off that:

"I stood there. Didn't know where I was for a few minutes. My mind kindly came to me, and I waited there until a car passed, and I asked a man in the car which way to Heidrick, and he told me to keep the railroad and not turn off and go on up the railroad, and I went on up the railroad until I saw where I got on the train, and I knew where my home was;"

and that it was raining when he got off the train and when he got home.

Upon cross-examination, he stated that the conductor came and got his fare when the train was nearing Beech Hill, about a mile and a half or two miles from Heidrick; that when the conductor came to get his fare,

he said, "Where is your fare, son?" when he gave 16 cents, the half fare from Heidrick to Rodonald, to him, saying, "Here it is;" that when he handed him the fare, "He didn't say anything. He went on and got the rest of the tickets and come back and told me I would have to get off"; and that when the train stopped at Beech Hill, the conductor said, "Son, you will have to get off." Plaintiff testifies:

"I told him that I gave him my money. He said, 'I can't help it. You will have to get off,' says, 'You will have to pay whole fare.' Told him I didn't have the money. Said, 'You look like a fifteen year old boy to me.'"

Further, he testified that:

"He [the conductor] pushed me down the steps, and I jumped from the two steps. I thought he was going to push me off, only he didn't."

Plaintiff further states that after waiting some fifteen or twenty minutes standing there at Beech Hill, where evicted from the train, he then walked down the railroad track, through the rain, sleet, and snow, to his home at Heidrick, where, upon reaching it, he went in and changed his clothes and, his head then beginning to ache, went to bed, where he was confined with some kind of a fever for about three weeks, during which his mother administered medicines to him and doctored him.

Plaintiff's testimony is further as to his then age on April 8, 1935, the day on which he was evicted from the train for his refusal to pay the regular full fare of 29 cents, that he was eleven years old lacking four days, having been born on April 12, 1924; that he "just knew" that was his birthday, though stoutly insisted that, tho' positive about it, neither his father or mother, or any onse else, had ever told him so.

Plaintiff is more than fully corroborated in his testimony as to his distressed condition upon reaching home, due to exposure to the wintry weather during his walk there of about a mile, more or less, by that of his mother, to the effect that when he reached home at about 1 o'clock she was excited by his appearance and at once had him change his clothes and put him to bed, where he was confined with both a fever and something like pneumonia for a period of two weeks; that she gave medicines to him and doctored him herself, as she was

unable to employ a physician. She also testified that his sickness was due to, and resulted from, his stated exposure to the snow, sleet, and rain in which left upon his wrongful ejection from the train. Further she testified as to his then age, that he was at such time about eleven years of age, having been born on April 12, 1924. As to this, she was also corroborated by the testimony of one Polly White, who testified that she waited upon her as a midwife at the time of plaintiff's birth, which took place on the date stated.

On the other hand, the account given by the conductor as to the facts and circumstances attending his putting plaintiff off the train on this occasion is that when he went to plaintiff for his ticket, he bave him 15 cents. "And I said, 'Where do you go, son?' He says, 'To Rodonald.' I says, 'The fare is 29 cents.' He says, 'That is all I have.' I give it back to him. I says, 'I can't take you for that.' He says, 'That is all I have.' I give it back to him. I says, 'I can't take you for that.' He says, 'I have rode on a half fare.' I says, 'You may have, but you are older than twelve years old.' So I stopped the train and he walked out and got off." When asked where he stopped the train, he answered: "I don't know exactly the distance, but it is between a half and three-quarters of a mile from Heidrick crossing to that public crossing there [Beech Hill]." He further testifies that after telling plaintiff that he would have to get off, he gave him his money back, which the boy took and walked down the aisle, out the door, and down the steps to the ground; that it was about 11 o'clock when he left the train, and that it was neither snowing nor sleeting at the time, but that it had been raining and sometimes that morning the sun was shining and some times it was cloudy; that nobody took hold of or led plaintiff off the train or took hold of him after leaving it, nor did he give him even a little shove as he went off the steps, but that he got off of his own free will.

Further, the evidence for appellant as to plaintiff's age on April 8, 1935, when put off the train for his failure and refusal to pay a whole or proper fare, and very strongly tending to show that he was at such time more than twelve years old, was the appellee's signed statement [introduced in evidence], given on May 2, 1934, to the company's agent when investigating a claim for damages made by his mother, Mary Jane Hooker, for an injury received in falling while attempting to alight

from appellant's train at Rodonald on April 23, 1934, in which appellee then stated, among other things: "My name is Andrew Hooker, age thirteen years. I am in the Fourth Grade, and live with my father." He was asked to read this portion of his statement but refused, stating on redirect examination when asked, "You know how they happened to put that [his age as thirteen years] in there?" that "The only way I figure it out he wrote a lie in it." Also, the evidence was that when appellee formerly lived on Log Mountain, near Pineville, his mother gave to Ben H. Partin, when taking the district school census, the information that appellee was born on April 12, 1921, which was incorporated in the official census of school district 25, Bell county, Ky., for 1934, and again gave the same information as to her son's age when the school census for the same district was being again taken in 1932 by the trustee.

Upon submission of the cause, upon this evidence and the court's instructions, the jury returns a verdict awarding plaintiff damages in the sum of $500, upon which judgment was accordingly rendered.

Appellant's motion and grounds for a new trial having been overruled, it appeals, relying for a reversal of the judgment upon the grounds: (1) That the court should have entered judgment for appellant on the pleadings, notwithstanding the verdict of the jury; (2) that the damages awarded are grossly excessive, and are the result of passion and prejudice; (3) that the court admitted incompetent evidence; and (4) that the instructions are erroneous.

Turning our attention to the consideration and disposition of the first of these assignments of error, it is to be noted that this action is brought by the plaintiff, by his mother as next friend; also, that while it does not appear on the face of the petition, or from her affidavit, that she was at the time under the disability of coverture, it is yet shown that upon appellant's taking the deposition of the plaintiff, Andrew Hooker, as if upon cross-examination, he therein stated and disclosed that he was the child of Dill and Mary Jane Hooker, with whom he was then living and making his home at Heidrick; and, further, that such fact was also well known to appellant.

Notwithstanding such information received by appellant, it proceeded to plead and establish its defense

without challenging the capacity of plaintiff to institute his suit by his mother as next friend, until after submission of the cause to the jury.

While section 37, subd. 1, Civil Code of Practice, provides that, "No person shall sue as next friend unless he reside in this State and be free from disability," and the word "disability" is by section 732, subd. 31, defined as meaning coverture, etc., the right to object to such incapacity to sue as next friend, by reason of such disability of coverture, is yet one that may be waived, as here we are of the opinoin was done by appellant, and correctly so held, through its failure to make timely objection by raising this question by a special answer setting out such discovered disability of coverture.

The defendant cites and relies upon the case of Fentzka's Adm'r v. Warwick Construction Co., 162 Ky. 580, 172 S. W. 1060, as upholding the lower court's ruling in refusing to allow plaintiff's father, Dill Hooker, to file an amended petition, substituting himself as next friend, in lieu of his incapacitated wife, in maintaining his son's suit.

However, the situation there presented was entirely different from the one before us and cannot be taken to support appellant's contention; there the suit was brought by one as administrator, who sued as, or was himself the plaintiff—not the deceased. The facts in the present case bring it rather within the purview of those found in the case of Kash v. Kash's Guardian, 260 Ky. 377, 85 S. W. (2d) 866, 867, holding that:

"The next friend is regarded as an agent or officer of the court, of the nature of a guardian ad litem, to represent the interest of the infant in the litigation. 31 C. J. 1118, 1126. The infant himself is the plaintiff. Lambert v. Corbin, 194 Ky. 373, 239 S. W. 453."

In view of these authorities, we are of the opinion that the trial court improperly refused to permit the father to file his amended petition, asking to be allowed to sue as next friend for his son, but properly overruled the defendant's motion for a judgment on the pleadings, notwithstanding the verdict, where the defendant had clearly waived its right to object to the incapacity of the mother to sue as next friend for her son.

We will next consider appellant's second objection,

that the jury's verdict, awarding damages in the sum of
$500 for the injury here claimed to have been done
plaintiff, was excessive.

The evidence as to the injury suffered by him is as
above set out, that his wrongful eviction from the train,
which necessitated his walking home through the rain
and cold, caused him to undergo some period of illness.
Such being the case, and in view of the jury's finding
that he was wrongfully put off the train, by reason of
his being at the time under twelve years of age and en-
titled to have passage on the train to Rodonald for one-
half fare, it follows that he was entitled to recover
damages in some amount. Such being the case, how-
ever, the next question is: Was the award of $500 dam-
ages excessive or more than compensatory, considering
the circumstances and the manner of appellant's agent
when evicting him from the train?

Appellant's contention is that in view of such evi-
dence, the verdict is excessive, and in support of its po-
sition relies on and cites several cases.

In Louisville & N. R. Co. v. Gibson, 250 Ky. 814, 64
S. W. (2d) 163, 164, the court, in considering a like con-
tention there made, said:

"In support of this position it relies on Louisville
& N. R. Co. v. Breckinridge, 99 Ky. 1, 34 S. W. 702,
17 Ky. Law Rep. 1303, where a verdict of $500 was
held excessive; on Lexington & E. R. Co. v. Lyons,
104 Ky. 23, 46 S. W. 209, 20 Ky. Law Rep. 516,
where a verdict of $260 was held excessive; on
Louisville & N. R. Co. v. Fish [Ky.] 127 S. W. 519,
43 L. R. A. [N. S.] 584, where a verdict of $500 was
held excessive; on Cincinnati, N. O. & T. P. R. Co.
v. Carson, 145 Ky. 81, 140 S. W. 71, where a verdict
of $400 was held excessive; and on Camden Inter-
state Ry. Co. v. Frazier, 97 S. W. 776, 30 Ky. Law
Rep. 186, where a verdict of $500.05 was held ex-
cessive. An examination of these cases will show
that in each instance the passenger ejected was not
subjected to any indignity or insult by the con-
ductor.'

The situation presented in these cases is the same
as that presented in the case before us, in that there is
no evidence whatever that Hooker, here the passenger
ejected, at such time was subjected, in the presence of

other passengers, to any indignity or insult entitling him to recover for mortification and humiliation of feeling.

Under such conditions, while appellee was clearly entitled to a verdict in some amount of compensatory damages only, the evidence being as above stated, it was manifestly insufficient, we conclude, to authorize a verdict for $500, which, in fact, appears much greater than the amount of actual damages sustained by appellee or than can be legally sanctioned by the court, and for such reason the verdict ought to have been set aside, and the lower court erred in failing to do so. It was not pretended that the evidence shows that the conductor did anything more than what he conceived was his duty, when, believing the boy to be over twelve years of age, he required him to pay whole fare or leave the train. He was in no wise abusive in conducting him off the train, but on the contrary, according to the boy's own testimony, he was polite and kind to him at the time, only telling him he would have to pay full fare or get off.

We are also further of the impression that the instructions as given were erroneous in failing to clearly set forth the one question, upon which the decision of the case under the pleadings and proof turns, which was whether or not plaintiff was at the time of his eviction by defendant's agent from its train, for refusing to pay a whole fare for his passage, then under twelve years of age; and the jury should have been clearly so instructed, that if it should believe from the evidence that plaintiff was at that time under twelve years of age, the law was for the plaintiff; if not, for the defendant.

Further, the instructions as given were erroneous in failing to instruct the jury upon the measure of damages, and that if it found for the plaintiff, it could not find any punitive damages, there being no evidence supporting same, but that their verdict should be confined to compensatory damages.

Therefore, for the errors thus committed upon the trial to the prejudice of the appellant, the judgment is reversed, and the cause remanded, with instructions for a new trial in conformity with this opinion.