RENDERED:  NOVEMBER 1, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0069-MR

LUVSHENDA HOWARD D/B/A THE
AMAZING JOURNEY, A KY
LICENSED CHILD CARE FACILITY                                      APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.          HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 23-CI-02761


KENTUCKY CABINET FOR
HEALTH AND FAMILY SERVICES,
OFFICE OF THE INSPECTOR
GENERAL                                                            APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, L. JONES, AND McNEILL, JUDGES.

ACREE, JUDGE:  Appellant, Luvshenda Howard d/b/a The Amazing Journey, a

Kentucky Licensed Child Care Facility, appeals the Fayette Circuit Court's

December 21, 2023 order affirming the Final Order of the Kentucky Cabinet for

Health and Family Services (Cabinet) denying Appellant's child care license.  We affirm.

## BACKGROUND

In January 2022, Howard opened The Amazing Journey (TAJ), a regulated child-care center operating under a preliminary child-care license issued by the Cabinet.  Howard served as the owner and director of TAJ.

On March 4, 2022, an enrolled one-year-old child (M.R.) arrived at the center with bruises and a scrape on her hip area, as well as bruising on her forehead.  An employee observed the injuries while changing her diaper.  The employee reported the child's condition to Howard, who took photographs of the bruises.  Neither the employee nor Howard knew what caused the bruises.[1]

Howard then contacted M.R.'s mother (Mother), provided her with the photographs, and informed her that M.R. came into TAJ with the injuries.  Mother told Howard the injuries could have resulted from M.R. playing with the family dog.  Howard testified she did not believe the bruise on M.R.'s head came from the dog.

---

[1] There is no allegation or concern that M.R. or her siblings were injured at TAJ.  It has since been determined the injuries occurred outside the facility.

Later in the day, Howard called Ms. Linda Fowles, her Child Care Aware Coach, seeking guidance as to the actions that should be taken.[2] Howard told Fowles she had concerns about a child and asked to send Fowles photographs of the injuries. Fowles refused to view the photographs, stating that in her capacity as a Child Care Aware Coach, she is not the appropriate authority to determine whether abuse or neglect has occurred. Instead, Fowles testified she reminded Howard that Howard is a "mandatory reporter," and if Howard suspects abuse or neglect, she is required to make a report to Child Protective Services (CPS), a division within the Cabinet. Howard did not contact CPS on March 4, 2022.

On March 7, 2022 – the following Monday – M.R. again came into TAJ with injuries. While changing her diaper, a different staff member noticed new bruising on her ears and multiple places on her head. Howard sent additional photographs to Mother who again responded that the bruises were caused by the family dog. Howard told Mother she did not believe the dog caused these bruises, and "[p]rotocol is for [her] to report it and reach out to CPS."

After the facility closed for the day on March 7, 2022, Howard called the CPS hotline.[3] However, Howard omitted information that would have enabled

---

[2] Child Care Aware is an entity that contracts with the Commonwealth of Kentucky to support child care providers by coaching them to comply with licensure requirements. To this end, Fowles' assistance consists of referring providers back to the regulations when questions arise.

[3] Howard later testified under oath that she did not make a report on March 4th because the marks on M.R.'s forehead were identified as "psoriasis," a condition for which M.R. had been treated

CPS to fulfill its responsibilities to investigate reports of child abuse or neglect.  In the phone call, Howard qualified her observations by saying, "I do know signs of child abuse, and I would not say they are being abused."  She went on to characterize M.R.'s bruises as "sores" and "dry patches":

> Howard: This baby comes in with like, I don't know, like, you know like those like, she has like sores in her hair, but I've seen it before and I know that some kids with allergies, it can come from that, or it could be like a food, I don't know exactly what it is . . . .
>
> CPS: Does she have bruising or marks in her hair, or both?
>
> Howard: It's not a – I don't know how to explain it, it looks like a, like a dry patch.  And if I –
>
> CPS: In her hair?
>
> Howard: Yeah.

At the end of the call, when the CPS intake worker summarized the information provided by Howard, she asked:

> CPS: Alright.  And they aren't showing signs of child abuse, they aren't scared of mom and dad, happy to see 'em – alright. Anything else?  Uh, so there were never any bruises –
>
> Howard:  It's all – but if it keeps happening, I'm going to keep taking pictures and I will keep calling you all.

---

prior to starting at TAJ.  According to Howard, by the time M.R. started at TAJ, the psoriasis was cleared up.  Notably, however, Howard did not identify any personal knowledge of "psoriasis" or any other specific medical condition during her March 7th phone call to CPS.

CPS determined the call did not meet acceptance criteria to initiate an investigation. Michelle Williams-Stevenson, CHFS Central Intake Supervisor, testified that had bruising been reported, it would have prompted CPS to formally investigate. (Video Record (VR) 4/18/23 at 0:31:00.)

On March 19, 2022, M.R. was taken to the hospital with head trauma, swelling around the eyes and bridge of her nose, lethargy, and what was described as a "puddle of water" under the back of her scalp. Hospital staff alerted CPS and the police, who in turn opened an investigation into M.R.'s family and TAJ.

Cabinet employees Josh Crowe and Pamela Handshoe visited TAJ on March 22, 2022 to conduct their investigation. Handshoe reported to Surveyor Kimberly Bush concerns of Howard not reporting possible child abuse or neglect. The following day, Surveyor Bush conducted an onsite investigation of TAJ and Howard memorialized her observations in an email to the Cabinet. In the email, Howard characterizes the injuries as "bruises" and alleges Fowles "instructed [her] not to" make a report during their phone call on March 4, 2022.[4]

In a letter dated April 25, 2022, the Office of Inspector General ("OIG"), a division of the Cabinet, informed Howard her preliminary child care

---

[4] Howard alleges that Fowles claimed, "It will look bad on you with you just now opening. It will look bad to other parents and you won't have any children in your center. The state will come into your center and throw the book at you." (Record (R.) at 18-19.) Fowles adamantly denies this allegation with sworn testimony that she "absolutely did not make those statements." (VR 4/18/23 at 2:42:30.)

license had been revoked and her regular license had been denied. The primary reasons for the denial were her failure to comply with 922 KAR[5] 2:090 § 8, which requires licensees to "protect and assure the health, safety, and comfort of each child[,]" and her failure to comply with 922 KAR 2:090 § 13, which provides that "[a]n incident of child abuse or neglect shall be reported to the cabinet pursuant to KRS[6] 620.030." In addition to the March 4, 2022 failure to report and the March 7, 2022 failure to report, the letter cites three additional failure-to-report violations.

First, during the week of March 14, 2022, M.R. "came into the facility on multiple days very lethargic, would not sit up easily in a chair, wanted to sleep all day, would not eat, was extremely whiny and appeared almost 'zombie like.'"

Second, Howard informed Surveyor Bush that on more than one occasion, Mother "had come into the facility for morning drop off and smelled like marijuana."

On a third occasion, M.R.'s older sibling was having a difficult day at the facility and a phone call was made to Mother. While the three-year-old child was on the phone, Mother's boyfriend was heard on the other end "yelling profanity at the child asking if he needed to come down there and f------ whoop his a--." The child wet his pants.

---

[5] Kentucky Administrative Regulations.

[6] Kentucky Revised Statutes.

Howard appealed the denial pursuant to 922 KAR 2:090 § 19(2) and a formal Administrative Hearing was held on April 18, 2023. The Hearing Officer heard testimony from Howard, Fowles, Surveyor Bush, Stevenson-Williams, and Dana Bixler and Melanie Barker, both of whom are licensed child-care facility owners.

After hearing witness testimony and reviewing contents of exhibits, the Hearing Officer made conclusions of law, including: (1) "OIG alleged that TAJ's child-care license was denied because Ms. Howard failed to comply with 922 KAR 2:090 because she failed to report suspected child abuse or neglect under KRS 620.030"; (2) "Under KRS 620.030(1), '*[a]ny person*' with firsthand knowledge or reasonable cause to believe that a child is abused has a mandatory duty to report it." (emphasis in original); (3) "Ms. Howard independently investigated M.R.'s bruises on March 4, 2022. She did not believe a dog caused bruising to M.R.'s head . . . Ms. Howard did not report to CPS immediately on March 4, 2022 (individually or as TAJ's director)"; (4) "On March 7, 2022, Ms. Howard called CPS but omitted information that would have enabled the cabinet to fulfill its responsibilities to investigate reports of child abuse or neglect, under KRS 620.030, .040, and .050"; and (5) "Ms. Howard's sworn testimony regarding the failure to report suspected child abuse or neglect was not credible."

The Hearing Officer then recommended the license denial be affirmed, which was adopted in a Final Order issued by the Cabinet's Secretary. Howard appealed this order to Fayette Circuit Court, which affirmed the Cabinet's order. This appeal follows.

## STANDARD OF REVIEW

KRS 13B.150 sets forth the standard by which a court shall review an administrative decision, stating that the reviewing court is to "be confined to the record," and:

> (2) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the final order or it may reverse the final order, in whole or in part, and remand the case for further proceedings if it finds the agency's final order is:
>
> > (a) In violation of constitutional or statutory provisions;
> >
> > (b) In excess of the statutory authority of the agency;
> >
> > (c) Without support of substantial evidence on the whole record;
> >
> > (d) Arbitrary, capricious, or characterized by abuse of discretion;
> >
> > (e) Based on an ex parte communication which substantially prejudiced the rights of any party and likely affected the outcome of the hearing;

(f) Prejudiced by a failure of the person conducting a proceeding to be disqualified pursuant to KRS 13B.040(2); or

(g) Deficient as otherwise provided by law.

KRS 13B.150. Here, where the circuit court upheld the administrative decision, we must determine whether the circuit court's findings are clearly erroneous, noting that "[t]he circuit court's role as an appellate court is to review the administrative decision, [not] to reinterpret or to reconsider the merits of the claim, not to substitute its judgment for that of the agency as to the weight of the evidence." *500 Assocs., Inc. v. Nat. Res. and Environmental Protection Cabinet*, 204 S.W.3d 121, 131 (Ky. App. 2006) (footnote omitted). So long as there is substantial evidence in the record to support the agency's decision, the court must defer to the agency, even if there is conflicting evidence. *Id.* (citing *Kentucky Comm'n on Human Rights v. Fraser*, 625 S.W.2d 852, 856 (Ky. 1981). Even if this Court would reach a different conclusion if it heard the case *de novo*, it must affirm the agency's decision when such decision is supported by substantial evidence. *Id.* Substantial evidence is that which "has sufficient probative value to induce conviction in the minds of reasonable [persons]." *Runner v. Commonwealth*, 323 S.W.3d 7, 10 (Ky. App. 2010).

## ANALYSIS

There are three issues before us. The first is whether Howard had reasonable cause to believe M.R. was abused or neglected on March 4, 2022, and March 7, 2022, thereby triggering her duty to report under KRS 620.030(1). The second is whether, if Howard had reasonable cause to believe M.R. was abused or neglected, she sufficiently reported the same in her phone call to CPS on March 7, 2022. The third is whether the Hearing Officer applied the correct standard in affirming OIG's license denial. We will address each in turn.

### I. Howard had reasonable cause to believe M.R. was being abused or neglected.

The duty imposed by KRS 620.030 is the duty to report dependency, neglect, or abuse. It is imposed on "[a]ny person, including but not limited to . . . child-caring personnel . . . who knows or has reasonable cause to believe that a child is dependent, neglected, or abused" and requires such an individual to "immediately cause an oral or written report . . . to be made to a local law enforcement agency or to the Department of Kentucky State Police, the cabinet or its designated representative, the Commonwealth's attorney, or the county attorney by telephone or otherwise." KRS 620.030(2)(a); KRS 620.030(1).

As child-caring personnel, Howard is clearly subject to the mandatory reporting requirements delineated in KRS 620.030. Consequently, if Howard knew or had reasonable cause to know that M.R. was dependent, neglected, or

-10-

abused, she was required to immediately cause an oral or written report to be made to the Cabinet, law enforcement, the Commonwealth's attorney, or the county attorney.

Howard directs us to two opinions, both of which involve public school systems and alleged violations of KRS 620.030 by public school staff: *Turner v. Nelson*, 342 S.W.3d 866 (Ky. 2011), and *Ritchie v. Turner*, 559 S.W.3d 822 (Ky. 2018).

*Turner* is inapplicable to the case at bar for two reasons. First, the victim and perpetrator in *Turner* were both five-year-old girls. The Court concluded the mandatory reporting requirement of KRS 620.030(1) "does not apply when a child inappropriately touches another child *unless* a parent, guardian, or other person exercising custodial control or supervision allows such inappropriate touching to be committed or creates or allows such a risk of abuse." *Turner*, 342 S.W.3d at 872 (emphasis in original). Here, there is no allegation that the bruises on M.R. were caused by another child. Regardless of whether she knew the cause of M.R.'s bruises, Howard remains subject to the duty within KRS 620.030(1).

Further, Howard misapplies to the present case the *Turner* Court's analysis of whether Turner was entitled to qualified official immunity from tort

liability. Quoting language from *Turner*'s qualified official immunity analysis,

Howard argues:

> KRS 620.030(1) only directs reporting by a "person who knows or has reasonable cause to believe that a child is . . . abused." Thus, where there is no actual knowledge of the event, there must be an objective determination that a reasonable belief existed. *Rowan County v. Sloas*, 201 S.W.3d 469, 482 (Ky. 2006) ("We make this . . . inquiry in light of the information that the defendant official possessed at the time of the incident in question . . . and cognizant of the fact that public officials generally are not hermetic, ivory-tower scribes versed in the vagaries of . . . law.'") (*quoting Kegler v. City of Livonia*, 173 F.3d 429 (6th Cir. 1999)); *see also Jefferson County Fiscal Court v. Peerce*, 132 S.W.3d 824, 834 (Ky. 2004).

(Appellant's Br. at 8 (quoting *Turner*, 342 S.W.3d at 877)). This standard was

formed within the context of whether a public school teacher was entitled to

qualified immunity, not whether a private child-care center director violated her

duty to report child abuse or neglect.

Assuming arguendo that the *Turner* standard applies to all persons and

is not limited to public officials seeking qualified official immunity, we

nevertheless find through an objective determination that Howard had reasonable

cause to believe M.R. was abused or neglected. We begin our inquiry with the

events of March 4, 2022.

On that day, M.R. came into the facility with bruises and a scrape.

Howard began investigating by taking photos and contacting M.R.'s mother for an

explanation. Howard testified that she did not believe the bruise on M.R.'s head came from the dog. Not knowing whether to report the bruises and marks, and not believing Mother's explanation, Howard then contacted Fowles to obtain an outside opinion on the matter. Howard argues that this independent investigation conforms to the methodology embraced by the court in *Turner*, that one must "make reasonable inquiry into the facts, weigh[] the credibility of each [party] and then us[e] her judgment and experience" to reach a decision. *Turner*, 342 S.W.3d at 878. To this extent, we agree. However, Howard contacted a third-party, Fowles, seeking further guidance after not believing the Mother's explanation and this is indicative of Howard's disbelief. We are persuaded these actions objectively demonstrate that after investigating on March 4, 2022, Howard had reasonable cause to believe M.R. was abused or neglected.

We continue our inquiry with the March 7, 2022 events. M.R.'s physical condition upon entering TAJ – various additional bruises on and around her head – provided further grounds for reasonable cause. Howard again took photographs of the new bruises and sent them to Mother. When Mother explained, again, that it was the family dog, Howard told Mother that she did not believe her, and protocol is to contact CPS. Based on Howard's own statements to Mother, Howard had reasonable cause to believe that M.R. was abused or neglected after investigating on March 7, 2022.

Howard also directs us to *Ritchie v. Turner*, a later case concerning a middle school teacher having a sexual relationship with a student and inappropriately texting two other students. 559 S.W.3d at 827. Like *Turner*, *Ritchie* involves a public school system and public-school officials. Specifically, officials asserted a defense of qualified official immunity as to claims regarding their failure to report a teacher after learning about his texting relationship with a student. Applying *Turner*, the *Ritchie* court held "no further action is required when one investigates and concludes there is no reasonable cause to believe that a child is being or has been abused. However, when one investigates and concludes reasonable cause exists, the report to a proper authority pursuant to KRS 620.030 is mandatory." *Id*. at 838. In light of our conclusion that Howard properly investigated and determined reasonable cause existed, the question is whether she made a sufficient report of her findings to CPS.

## II.    Howard did not make a sufficient report to CPS.

Although Howard called CPS on March 7, 2022 and briefly mentioned bruises, her characterization of the marks on M.R.'s person omitted necessary information regarding her independent investigation that would have met acceptance criteria for CPS. As such, Howard's phone call to CPS on March 7, 2022 did not satisfy her statutory duty to report. The Cabinet draws our attention

-14-

to Circuit Judge Bunnell's statement that "[Howard] called, but she didn't report." (Appellee's Br. at 10 (quoting VR 12/19/23 at 1:09:05)). We agree.

The entirety of the 11-minute and 27-second phone call was played as evidence during the administrative hearing and during oral arguments at the Fayette Circuit Court. Around the 25 second mark, Howard uses the term "bruise," saying "I don't know what type of – these bruises are." After explicitly stating, "I do know signs of child abuse, and I would not say they are being abused," Howard describes the bruises as "sores." When the intake worker asked whether the marks were bruises, sores, or both, Howard says, "It's not a – I don't know how to explain it, it looks like a, like a dry patch." This is directly at odds with Howard's subsequent statements to the investigator, that she describes the marks seen on March 4th and 7th as "bruises." (Appellee's Ex. 3, "Emails from Luvshenda Howard" at 2.)

Despite calling, Howard did not report the true nature or extent of M.R.'s injuries in accordance with KRS 620.030. Instead, she misrepresented the nature of the injuries and downplayed any concerns she had regarding their origin, the results of her investigations, and suspicions of the family. At no point in the call does Howard relay her investigation findings – that Mother stated it could have been the family dog – nor does she inform the CPS intake worker that she found Mother's explanation incredible. CHFS Central Intake Supervisor Stevenson-

Williams testified that had Howard relayed the true and full extent of what she observed and learned, CPS would have been prompted to formally investigate. Failure to report these concerns constitutes a violation of her statutory duty as a mandatory reporter. Based on the foregoing, the Cabinet did not err in concluding Howard violated KRS 620.030 and 922 KAR 2:090.

### III.     The Cabinet applied the correct standard in affirming OIG's license denial.

Finally, Howard argues the Recommended Order of the Hearing Officer and the Final Order adopted by the Cabinet applied an incorrect rule of law in determining whether Howard complied with KRS 620.030. Specifically, she contends the Cabinet chose to apply a "reasonable suspicion" standard instead of the statutory standard of "reasonable cause to believe" in reference to child abuse or neglect. We disagree.

Howard does not direct us to any authority distinguishing between "reasonable suspicion to believe" and "reasonable cause to believe." Nor does Howard demonstrate any harm suffered from the alleged misapplication. While a "reasonable suspicion" standard for triggering reporting duties would be incorrect, the Hearing Officer appears to describe the *nature* of M.R.'s condition as "suspected abuse." The purpose of the administrative hearing is not to make a factual determination regarding whether abuse *had* occurred; for the Hearing Officer to refer to M.R.'s condition as "abuse" instead of "suspected abuse" would

draw findings of fact which the record could simply not support. It appears to us any reference made by the Hearing Officer to "suspected abuse" refers not to the standard by which he evaluated Howard's claims, but rather to the actual condition of M.R. Based on review of the record, the Hearing Officer reasonably inferred that Howard had reasonable cause to believe M.R. was abused or neglected, which constitutes substantial evidence. We find that any error committed is harmless.

## CONCLUSION

For the foregoing reasons, we affirm the Fayette Circuit Court's order affirming the Final Order of the Kentucky Cabinet for Health and Family Services denying Appellant's child care license.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Reginald L. Thomas
Lexington, Kentucky

BRIEF FOR APPELLEE:

Amy N. Robertson
Frankfort, Kentucky